**APPLERA CORPORATION and Roche Molecular Systems, Inc., plaintiffs,**

v.

**MJ RESEARCH INC. and Michael and John Finney, defendants.**

No. 3:98CV1201 (JBA).

United States District Court, D. Connecticut.

March 30, 2005.

Aimee Jennifer Wood, James T. Shearin, Pullman & Comley, Bridgeport, CT, Asim Varma, Bertrand R. Lanciault, III, David Gersch, Michael J. Klyce, Jr., Arnold & Porter Thurman, Jean C. Kalicki, Arnold & Porter, Mary L. Azcuenaga, Wendy Schechter, Heller Ehrman White & McAuliffe LLP, Washington, DC, Bruce J. Barker, Brian M. Poissant, Pennie & Edmonds, Charles W. Bradley, Jennifer Gordon, Joseph Evall, Robert A. Cote, Stephen J. Lib, Arrack, Herringbone & Sutcliffe, Lawrence B. Goodwin, Chadbourne & Parke, New York, NY, Gwen P. Weisberg, Pullman & Comley, James Sicilian, Mario R. Borelli, Robin L. Smith, Day, Berry & Howard, Hartford, CT, Jennifer K. Lawson, Testa, Hurwitz & Thibeault, Boston, MA, for Plaintiffs.

A. Jason Mirabito, Brett N. Dorny, Geri L. Haight, Ivor R. Elrifi, John A. Harre, Joseph G. Blute, William A. Marino, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Joseph B. Darby, III, Greenberg & Traurig, Boston, MA, Albert L. Jacobs, Jr., Gerard F. Diebner, Joseph M. Manak, Greenberg Traurig, Christine Cora True-Frost, David A. Hoffman, John E. Beerbower, Latisha Thompson, Radu A. Lelutiu, Rudolf Koch, Cravath, Swaine & Moore Firm, Daniel A. Ladow, Graham &

James, Mary Morabito Rosewater, Schulte, Roth & Zabel, New York, NY, C. Allen Foster, David S. Panzer, Kevin E. Stern, Timothy C. Bass, Greenberg Traurig, LLP, William C. Brashares, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, Donna Nelson Heller, Harold Bolton Finn, III, Meghan A. Laganza, Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT, for Defendants.

**Ruling on Motion for Reconsideration of MJ Research, Inc. and Michael and John Finney of the Court's Opinion and Order Granting Plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse [Doc. # 1259]**

ARTERTON, District Judge.

On December 22, 2004, this Court issued a decision denying defendants' (collectively, "MJ") Motion for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty and granting Plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty and Thus is Not Patent Misuse. *See* [Doc. # 1253]. Defendants now move for reconsideration. The motion is granted, and for the reasons discussed below, the Court declines upon reconsideration to change the substance of its earlier decision.

Defendants argue that this Court overlooked evidence that (1) MJ's May 1995 counterproposal set out an alternative supplier license based on actual use, and MJ began objecting to the SAP "formula" as early as 1995; and (2) the condition in Applera's October 1996 proposal that MJ "disable" for PCR its non-authorized thermal cyclers would prevent MJ from offering a commercially viable thermal cycler for non-infringing uses. MJ contends that in view of these facts, the Court's legal conclusions were in error. MJ also argues that the conclusion that the certification requirement in the October 1996 proposal did not exceed Applera' patent rights was in error.

**A. MJ's May 1995 counterproposal**

Accompanying a May 2, 1995 letter to Hanna Fischer of Applera, Michael Finney proposed a thermal cycler authorization agreement that would permit MJ to "sell and distribute Base Units, manufactured by or for MJ Research or otherwise carrying its brand name, that carry a label ... that conveys to end users (including MJ Research itself) in the Fields the up-front rights under Perkin–Elmer's PCR process license of the Application Patent Rights," Proposed Agreement [Doc. # 1261, Ex. 1] at § 2.1(a), to "sell and distribute separately Authorizations for Base Units manufactured by or for MJ Research," *id.* at § 2.1(b), and to "advertise and promote Base Units carrying Authorizations as Authorized Thermal Cyclers for PCR," *id.* at § 2.1(c). In this proposal, MJ offered to "maintain on its price list, and on similar documents, entries for each type of Base Unit showing the price of each Base Unit with the specified Authorization," *id.* at § 4.1, and agreed to include "in any advertisement for any Base Unit that mentions PCR, a notification of the availability of Authorizations", § *id.* at 4.5. The proposed agreement also provided that MJ would make a "good-faith attempt, within ninety (90) days of the effective date of this Agreement, to contact all owners of MJ Research Base Units in the United States ... to notify those owners of the availability and price of Authorizations." *Id.* at § 4.6.

In the proposed agreement, the responsibility to obtain licenses would rest exclusively with the end user. Under its terms:

> It is expressly understood and agreed that MJ Research is selling Authorized Thermal Cyclers and is selling the separate Authorization Status for Base Units previously sold solely as a licensee of Perkin–Elmer and that such sales are in respect of the ultimate license by Perkin–Elmer of its Amplification Patent Rights to each applicable end user. *The decision to purchase an Authorization, either separately or in conjunction with an Authorized Thermal Cycler, shall rest solely and exclusively with each end user, and MJ Research shall be under no requirement to investigate, determine or notify Perkin–Elmer, in any respect, concerning whether any end user or any class of end users is or is not engaged in activities that constitute an infringement of the Amplification Patent Rights.* Nothing in this Agreement shall be construed to impose any obligation on MJ Research to investigate any customer or end user or report any information whatsoever about any party to Perkin–Elmer. All customers, end users of Base Units and all other business contacts of MJ Research shall remain the sole and exclusive confidential information of MJ Research, and except for the information required to be disclosed as specified pursuant to Section 3.3. above, MJ Research shall bear no obligation to provide, and Perkin–Elmer expressly agrees and disclaims the right to request, any information concerning the customers, end users or business contacts of MJ Research.

*Id.* at § 11.1 (emphasis added).

In response, Hanna Fisher wrote, "With regard to the Authorization rights, which were also discussed in my letter of February 23, our past proposal is still available. At present, my ability to vary the offered terms is limited, however, because of our desire to treat licensees equally. Your proposal in Michael Finney's May 2 letter is unacceptable for that reason, among others." Letter from Hanna Fisher to John and Michael Finney, August 1, 1995 [Doc. # 1261, Ex. 2].

█ MJ characterizes this exchange as an offer by MJ of an alternative supplier license based on whether the thermal cyclers were actually used for PCR, and a firm rejection by Applera of any actual use proposal, with the result that Applera unlawfully conditioned the grant of its patent license based on acceptance of a total sales royalty prior to Applera's October 1996 actual use proposal. The Court disagrees. In the December 22, 2004 decision, this Court found (1) that the record reflected no more than an ongoing negotiation process between Applera and MJ between May 1994, when the Supplier Authorization Program ("SAP") was introduced, and October 1996, when Applera offered an alternative based on actual use; and (2) that "MJ never expressly rejected the SAP formula, and never submitted a counter-proposal for an alternative *supplier* licensing plan based on actual use." *See* Ruling [Doc. # 1253] at 20. The evidence on which MJ now relies does not change these conclusions. MJ's proposed agreement cannot be deemed a supplier license, as it made payment for a thermal cycler authorization a voluntary decision resting exclusively with the end user, not with MJ. Moreover, while the proposal would have permitted MJ to "advertise and promote Base Units carrying Authorizations as Authorized Thermal Cyclers for PCR," Proposed Agreement at § 2.1(c), the proposal would not immunize MJ from infringement liability for any promotion or inducement to perform PCR on "unauthorized" thermal cyclers, and imposed no obligations on

MJ to ensure that it would not induce infringement. As such, while this proposal was presented as a licensing contract between MJ and Applera, it merely reflects an effort to codify MJ's offer to distribute end user licenses, which was discussed at length in this Court's earlier decision.

Moreover, MJ's evidence cannot support the conclusion that Applera rejected any actual use alternative to its SAP, which is necessary for finding unlawful "conditioning" on a total sales royalty. Applera's August 1, 1995 response to MJ's proposal states that its ability to alter the original SAP terms was "limited." As this Court's earlier decision noted, while Applera's letter reflects a hardening of its negotiating position, there is no evidence that Applera refused to consider any non-total sales-based alternatives.[1] Applera's dealings with other thermal cycler suppliers, including Stratagene, supports the conclusion that it remained willing to consider and negotiate based on actual use.[2]

MJ argues that it would be inequitable to allow Applera to collect damages for infringement during the period of ongoing negotiations between MJ and Applera, when MJ objected to the terms of Applera's licensing proposal. MJ has offered no grounds, however, for altering this Court's earlier decision that Applera did not condition its license on acceptance of a total sales royalty. In the absence of a finding of patent misuse, there is no inequity in awarding damages for MJ's infringement.

## B. Software Disabling

■ Next, MJ argues that the Court erred in finding that there was no evidence that Applera's October 1996 proposal was a less than genuine alternative to a total sales royalty. In particular, MJ takes issue with the 1996 proposal's requirement that MJ disable the software in the thermal cycler providing for automated performance of PCR, arguing that the trial testimony supports the conclusion that a "thermal cycler cannot be disabled from performing PCR without destroying much of its general programmability." Memorandum of Law in Support of MJ Research, Inc. and Michael and John Finney's Motion for Reconsideration [Doc. # 1260] at 11. The Court's December 22, 2004 decision found an absence of any evidence that Applera's actual use proposal, as an objective matter, "exceeded the legitimate costs of administration of a license within the scope of Applera's patent," and, although it found it unnecessary to address whether as a subjective matter Applera intended for MJ to reject the alternative, noted that "[t]here are no facts in the record establishing how Applera would know" that disabling the PCR software in thermal cycler machines would be

---

1. This Court's earlier decision reviewed the communications between Applera and MJ during this time period demonstrating the process of negotiation. *See, e.g.* Letter from Hanna Fischer to Michael Finney, Feb. 23, 1995 [Doc. # 1124, Ex. 4] at 2–3 ("[W]e can negotiate provisions for various situations based on your actual experience. I think other approaches to granting your company the right to convey up-front rights of a PCR license are less simple and more costly, but we are willing to consider any proposal.").

2. The earlier decision broadly concluded that "when Stratagene, another thermal cycler supplier, requested a royalty based on actual use, Applera agreed." *See* Ruling [Doc. # 1253] at 24. However, a more precise characterization of Applera's reaction to Stratagene's actual use proposal is that Applera agreed to negotiate a new agreement based on actual use. *See id.* at 24 n. 17. As MJ points out, Stratagene decided not to renegotiate its licensing agreement with Applera once informed of Applera's suit against MJ. *See* Letter from Hanna Fischer to Brent Keller, July 31, 1998 [Doc. # 1261, Ex. 5].

problematic. As the Court stated, "the record of MJ's contemporaneous communications with Applera reveal only a generalized concern that MJ did not want to police its customers," and MJ did not inform Applera of its concerns about disabling the PCR software. *See* Ruling [Doc. # 1253] at 31 n. 20. The trial testimony on which MJ now relies does not alter this conclusion. Michael Hunkapiller, for example, testified that "the programming that's carried out during the protocols" in cycle sequencing is different from that used in PCR. *See* Testimony of Michael Hunkapiller, Trial Tr. [Doc. # 1098] at 527:2–8. Dr. Hunkapiller further testified:

> [T]he cycle sequencing protocols actually have to be a little more detailed than the PCR protocol, and it has to do with the fact that you are dealing with non-normal components being added to the DNA, and you are dealing with a single strand, not two strands. . . . You have to design protocols in this case that are optimized to make the enzymes work with these distorted components, and that typically involves substantial differences in the nature of the protocols.

*Id.* at 527:12–25.

Dr. Hunkapiller thus identified differences in programming for PCR and programming for cycle sequencing. He did not testify that disabling the software for PCR protocols would make the thermal cycler unprogrammable. MJ has not identified any other record evidence about the feasibility of disabling software for the performance of PCR.

MJ also argues that it is possible to infer that Applera knew the software disabling requirement was impossible to achieve because Applera removed this requirement in its revised January 1998 proposal. In a deposition, Dr. Fischer testified that the provision was dropped after

an Applera "had a discussion with MJ Research on the difficulty in complying with that particular requirement." *See* Deposition Testimony of Hanna Fischer [Doc. # 1261, Ex. 3] at 866. Far from supporting MJ's view that this shows Applera intended MJ to reject its actual use proposal, this evidence suggests Applera's responsiveness to MJ's identification of particularly burdensome aspects of their proposal.

## C. Certification Requirement

■ MJ argues that Applera's certification requirement exceeded Applera's patent rights because it was unrelated to the purpose of a supplier license. This Court's earlier decision concluded that the certification requirement was a proper means "to prevent inducement of infringement, and to ensure that purchasers of MJ thermal cyclers who use the machines for PCR in its fields pay a royalty fee, and that only those who genuinely do not need the license do not pay." Ruling [Doc. # 1253] at 33–34. MJ's argument that actions subsequent to the sale of a thermal cycler would not constitute inducement are unpersuasive, particularly since Applera's evidence at trial focused in large measure on MJ's advertising and promotional activities, even subsequent to the time of the sale (such as providing free PCR kits), and on MJ's provision of technical assistance for PCR to existing customers. Whether MJ could have avoided infringement liability by stopping its promotional activities is a question this Court need not address; during the period of time when MJ was engaging in such promotional activities, licensing requirements aimed at these otherwise infringing activities were within Applera's patent rights. MJ has identified no authority suggesting that the legal analysis set forth in the December 22, 2004 decision was in error.[3]

---

3. Because this Court concluded that Applera's   licensing program did not constitute patent

Accordingly, defendants' Motion for Reconsideration [Doc. # 1259] is GRANTED, and upon reconsideration, the Court declines to amend its December 22, 2004 decision denying MJ's Motion for Summary Judgment Determining that Plaintiffs' Licensing Scheme Imposes a Total Sales Royalty, and granting plaintiffs' Cross Motion for Summary Judgment Seeking a Determination that Applera's Licensing Program does not Impose an Improper Total Sales Royalty.

IT IS SO ORDERED.

misuse, the authority MJ relies on regarding purging the misuse is not relevant.